IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 30, 2008 Session

## STATE OF TENNESSEE v. MITCHELL DELASHMITT

**Interlocutory Appeal from the Circuit Court for McMinn County**
**No. 03-237     Carroll L. Ross, Judge**

**No. E2007-00399-CCA-R9-CD - Filed August 7, 2008**

In this interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, the State challenges the trial court's suppression of the defendant's June 23, 2003 statement to police. Because we agree that the defendant's Fourth, Fifth, and Sixth Amendment rights, as well as certain statutory rights, were violated in the procuring of the statement, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Steven Crump, Assistant District Attorney General, for the appellant, State of Tennessee.

Katherine L. Harp (on appeal); and John E. Eldridge and Steven B. Ward (at trial), Knoxville, Tennessee, for the appellee, Mitchell Delashmitt.

**OPINION**

The sequence of events giving rise to this appeal began on June 19, 2003, when the defendant's 14-month-old daughter, Angel Delashmitt, was discovered unresponsive in a pond near the defendant's home. The defendant summoned an ambulance and drove to the hospital in his own vehicle. Resuscitation efforts were unsuccessful, and the victim was declared dead at the hospital. The defendant was first questioned about the victim's death at the hospital, where he admitted falling asleep while the victim was in his care. He was arrested on a charge of criminally negligent homicide and taken to the McMinn County Jail, where four days later he signed a statement indicating that he had raped and shaken the victim. The trial court's suppression of that statement and a videotaped "follow-up" is the subject of this appeal.

For purposes of clarification and context, we will briefly summarize the two components that comprise the statement at issue in this opinion. The first part of what we are collectively calling "the statement" is a recitation of facts written by Detective B.J. Johnson during an interview following the defendant's polygraph examination on June 23, 2003. This portion of the statement is written entirely in Detective Johnson's handwriting but signed by the defendant. In it, the defendant states that after dinner on June 19, 2003, he watched a pornographic videotape in the living room while the victim sat on the couch. He stated that as he watched the videotape, he first fondled the victim with his penis before penetrating her anus briefly. According to the statement, the defendant stopped when the victim cried and then shook her to get her to stop crying. When she stopped crying, he replaced her diaper, and returned her to the couch, where she remained while he fell asleep in a chair. At that point, the victim was alive. The defendant stated that he was awakened by a neighbor and then realized that the victim was gone. He and the neighbor found the victim in a nearby pond. Another neighbor performed CPR until an ambulance arrived. The videotape recording portion of the statement features Tennessee Bureau of Investigation (TBI) Agent Barry Brakebill going over the written statement with the defendant. The defendant makes no affirmative statements regarding the injuries to the victim and, instead, provides yes and no answers to the agent's questions.

The hearing on the defendant's motion to suppress occurred on January 4, 2006, December 7, 2006, and February 2, 2007, in order to accommodate the schedules of various State and defense witnesses. Although the proof was taken out of order, we have arranged the proof in a more traditional order.

*Defense Proof*

Doctor Darinka Mileusnic-Polchan, Knox County Assistant Chief Medical Examiner, testified that, at the defendant's request, she had reviewed the 9-1-1 call, the original autopsy report prepared by McMinn County Medical Examiner Doctor Ronald Toolsie, the victim's medical records, the TBI records from this case, autopsy photographs and slides, and the sworn statement provided by the victim's mother, Rebecca Dunn, taken at the time of the victim's death. Doctor Mileusnic-Polchan opined that Doctor Toolsie's conclusions that the victim had been sexually assaulted prior to her death and that she died as a result of shaken baby syndrome and blunt force trauma to the abdomen had been reached in error.

According to Doctor Mileusnic-Polchan, Doctor Toolsie's conclusion that the victim suffered from shaken baby syndrome was based, in part, upon his finding that the victim had suffered a subdural hemorrhage prior to her death. Doctor Mileusnic-Polchan explained, however, that "[w]hat Dr. Toolsie described as a subdural hemorrhage was an autopsy artifact found in every single autopsy," rather than a true subdural hemorrhage. She elaborated, "What Dr. Toolsie is describing is a leaking of the veins in the sinus that is found in 100% [of] autopsies, adults, babies, regardless of the age." Doctor Mileusnic-Polchan noted that leaking of the sinus veins occurs when the dura, a tough fibrous membrane between the brain and skull that contains numerous blood vessels, is separated from the brain during the autopsy. Doctor Mileusnic-Polchan testified that because "we don't have the first and the main prerequisite, and that's a true, subdural hemorrhage," she was able to rule out shaken baby syndrome as a cause of death. Doctor Mileusnic-Polchan also

noted that because Doctor Toolsie did not remove the victim's eyes during the autopsy, there is no "evidence of retinal hemorrhage . . . . which is [a] very important element of . . . shaken baby." She testified that the absence of a full body x-ray made it impossible to look for evidence of rib fractures, a third important element of shaken baby syndrome. During cross-examination, Doctor Mileusnic-Polchan explained that although there was evidence of cerebral edema, or swelling of the brain, cerebral edema in this case is not an accurate indicator of shaken baby syndrome because it is also found in drowning and because the edema was slight. In addition, marks on the victim's neck that Doctor Toolsie described as "pinch marks" were actually the result of the "interstitial tube being secured with tape."

Doctor Mileusnic-Polchan also ruled out blunt force abdominal trauma as a contributing cause of the victim's death because evidence of such injuries "does not exist" in the autopsy photographs or slides taken by Doctor Toolsie. She stated that "what's shown actually in the picture as so-called damage is a continuous degradation of the small bowel . . . . which is [an] artifact from post-mortem change, from resuscitation, . . . or so-called shock bowel." She noted that the "purplish" color of the bowel was not evidence of blunt force trauma and was instead a textbook symptom of shock bowel. During cross-examination on this issue, Doctor Mileusnic-Polchan noted that there was no contusion of the abdominal wall, which ruled out a diagnosis of blunt force abdominal trauma. She explained, "You cannot contuse the bowel without causing contusion of the abdominal wall."

Doctor Mileusnic-Polchan concluded that "there is absolutely no documentation to support sexual abuse" findings in this case. She testified that although there was some slight dilation of the victim's anus, the dilation was attributable to the normal, passive dilation of smooth muscle tissue postmortem. She also noted that the victim's medical records revealed a documented history of chronic, severe constipation that was treated by the use of suppositories. Additionally, the sworn statement from the victim's mother confirmed that the victim had very hard stools and frequent constipation. Doctor Mileusnic-Polchan stated that the photographs taken during the autopsy do not show any evidence of sexual assault and instead show "a combination of lividity and diaper rash." She testified that photographs of the victim's hymen show "no evidence of sexual abuse, recent or remote." During cross-examination, she stated that the photographs do not show any "fissures, lacerations whatsoever."

Doctor Mileusnic-Polchan testified that although "drowning is a hard diagnosis to make," it was her opinion that the victim had, in fact, drowned. She explained that the presence of "tremendous edema," detritus, and "vegetation[-]like matter" in the victim's lungs confirmed a diagnosis of drowning. She stated that Doctor Toolsie's finding that there was no water in the victim's lungs at the time of autopsy did not rule out a diagnosis of drowning because in a "fresh water drowning, the water is frequently, very quickly going to transfuse from the alveolar space into the tissue" as a result of osmosis. She noted that Doctor Toolsie's failure to weigh the lungs made her diagnosis more difficult, but the microscopic slides of lung tissue did confirm the edema.

A letter from Doctor Bruce Levy, Chief Medical Examiner for the State of Tennessee, confirmed the findings of Doctor Mileusnic-Polchan. Doctor Levy, who reviewed the case at the request of the State, stated,

Frankly, I am shocked by the opinions and conclusions of Dr. Toolsie regarding the death of this child. In general, it shows a lack of understanding of the definition of medical diagnoses, how these pathologic diagnoses are made, and the ability to sort out injury from artifact. Fortunately, Dr. Toolsie did perform a thorough autopsy and documented the condition of the body with both gross photography and preparation of microscopic slides. . . .

The first diagnosis is listed as "Evidence of blunt force trauma to abdomen." To support this diagnosis, Dr. Toolsie lists a contusion of the ileum (a portion of the small intestines) and hemoperitoneum (blood in the abdominal cavity). The photographic images that Dr. Toolsie provided do[] not show a contusion of the intestines, but instead represent[] ischemic change to this portion of the intestines. The hemoperitoneum is not blood, but a serosanguinous fluid, which is a type of fluid seen with this type of intestinal ischemia. The microscopic slides provided also support a diagnosis of ischemic change and not trauma. These findings would be consistent with the reported history of a drowning and attempted resuscitation.

The second diagnosis is listed as "Evidence of shaken baby syndrome." Shaken Baby Syndrome (SBS) is defined as trauma to the brain caused by violent shaking. The three major findings of SBS are: [s]ubarachnoid and/or subdural hemorrhage, diffuse axonal injury and retinal hemorrhages. None of these findings are present on the autopsy of [the victim]. The findings Dr. Toolsie lists in his autopsy report to support his diagnosis of SBS may be seen in victims of SBS, but are so nonspecific and general as to be meaningless without the three major findings listed above. There is some evidence of slight cerebral edema (brain swelling), even though the convolutions of the gyri remain basically rounded. This finding is common in many different types of death, including drowning. The "hemorrhage" adjacent to the superior sagittal sinus is artifact of the removal of the skull and does not represent injury. The "pinch marks" to the posterior neck could be an artifact of the medical treatment, especially if an endotracheal tube or other apparatus was taped down in this area. Even if this remains as an unexplained injury, it has nothing to do with the diagnosis of SBS. Similarly[,] pulmonary contusions or hemorrhage around the aorta and esophagus have nothing to do with SBS. In fact, [the victim] did not have pulmonary contusions, but had marked vascular congestion of the lungs with alveolar hemorrhage, another common artifact in forensic autopsies.

The third diagnosis is listed as "Evidence of recent sexual assault." The listed swelling and erythema of the vulva appears most consistent with post-mortem settling of blood, but might represent a mild diaper rash. The injuries Dr. Toolsie notes to the clitoris, labia minor and posterior hymen are not present on the photographic images he provided or documented on the microscopic slides. The observed "dilation" of the rectum is not normal, but is typical after death. This reported irregularity also needs to be put into the context of an intestinal disorder that has been treated with suppositories, something it does not appear that Dr. Toolsie did as part of his investigation into this death.

The contusions and abrasions of the forehead and lower extremities (including the ankles) are minor and consistent with accidental injuries in a normal toddler of this age.

The final diagnosis of "No anatomical evidence of drowning" is misleading at best. There are no diagnostic pathologic or anatomic findings of drowning. It is a common misconception that drowning victims need to have water in the lungs or middle ear, and that the lack of such water can lead to the conclusion that the person was dead before being placed in the water. The reality is that drowning victims can have "dry" lungs and that deceased bodies placed in water can have "wet" lungs.

In conclusion, based on my review of this death, it is my opinion to a reasonable degree of medical certainty that there is no physical evidence from the autopsy to support the diagnoses of blunt force trauma to the abdomen, shaken baby syndrome or recent sexual assault. It is also my opinion to a reasonable degree of medical certainty that the cause of death provided by Dr. Toolsie, "Cerebral edema and intra-abdominal hemorrhage due to blunt force trauma consistent with shaken baby syndrome," is incorrect and is not supported by the findings of the autopsy. Finally, based on my review of the autopsy and the circumstances of this death it is my opinion to a reasonable degree of medical certainty that [the victim] most likely died as a result of drowning.

Rebecca Delashmitt, the defendant's stepmother, testified that she saw the victim every day and confirmed the victim's history of chronic constipation and hard stools. She stated that she had instructed the victim's mother to give the victim an enema of warm water and dish soap on more than one occasion. Ms. Delashmitt stated that she "had even taken [her] finger and dug it out of [the victim] to relieve her constipation."

-5-

McMinn County attorney Randy Rogers testified that he was contacted by the defendant's family on Friday, June 20, 2003, and asked to visit the defendant in jail. Mr. Rogers stated that he saw the defendant in the holding cell in the booking area of the jail, where he had been held "for several hours at least," and recalled that the defendant had not been told the charges against him. Mr. Rogers testified that he spoke with the defendant for approximately 45 minutes and then left to telephone Judge Steven Bebb about setting bond for the defendant. According to Mr. Rogers, Judge Bebb set bond, and Mr. Rogers relayed this information to the defendant and his family. As he was assisting the family in contacting a bondsman, the booking agent came in and told them that the bond had been rescinded because more serious charges were likely to be added. Mr. Rogers stated that he told the defendant that there was nothing more he could do on the bond issue and instructed him to tell the detectives that he had a lawyer and would make no more statements outside the presence of counsel. Mr. Rogers testified that he made it clear that he would represent the defendant on an as-needed basis until the final charges were brought and a fee could be set. Mr. Rogers stated that he expected to hear from the defendant over the weekend but did not. He testified that as a general rule, individuals arrested over the weekend are arraigned on Monday morning at 9:00 a.m.

During cross-examination, Mr. Rogers testified that he had made a commitment to represent the defendant during any interrogation. He stated, "I left there thinking that if [the defendant] told the detectives and investigators at the sheriff's department . . . that I represent him and I wanted to be present, then they would have called me like they always did."

Forensic Psychologist Doctor Gregory DeClue testified that at the request of the defendant, he reviewed numerous documents and records associated with the investigation in this case and interviewed the defendant on December 7, 2005. Doctor DeClue stated that he gave the defendant tests to determine his amenability to coercion, his tendency for suggestibility, his ability to understand written and oral communication, and the presence of any mental disease or defect. Doctor DeClue also administered a test to determine the defendant's level of effort on the other tests in order to gauge the reliability of the tests. According to Doctor DeClue, the defendant's full scale IQ, as established by earlier testing, is 78, which is in the borderline range for mental retardation. After establishing that the defendant was putting forth his best effort, that he was not "faking bad," and that he was not being dishonest with regard to the questions, Doctor DeClue determined that the defendant reads at a third to sixth grade level and that his oral comprehension skills are at the eleventh to twelfth grade level.

Doctor DeClue testified that during testing to determine his amenability to suggestion or coercion, the defendant "yielded to the subtle pressure from the examiner to provide an answer that [was] consistent to the question even though" it was not factually accurate. The defendant's answers "showed a strong tendency" to accept factual inaccuracies imbedded in the leading questions. According to Doctor DeClue, testing also established that the defendant was considerably more compliant with police interrogation than an average member of the population. Doctor DeClue stated that "the combination of [the defendant's] low reading ability and his significantly impaired working memory . . . makes it very difficult for him to understand information that's presented to him in written form, or information that is read to him." Doctor DeClue testified that the defendant's

difficulties in this area made it unlikely that the defendant understood any of the written waivers presented to him during his interrogation. As a result, he opined, none of the waivers was voluntary.

Doctor DeClue also concluded that the defendant's "was not a voluntary statement." He stated that because of his low IQ and ninth grade education, the defendant lived "a marginal existence." Doctor DeClue opined that the conduct of the law enforcement officers in this case led to the defendant's involuntary statement. Specifically, the defendant was held in isolation for more than 90 hours and not informed of the charges against him, even when he asked. In addition, the officers misled the defendant by telling him that DNA testing would not be possible once he was arraigned and that he would be permitted to "bond out" after his arraignment. Doctor DeClue also noted that the police contaminated the interview process by revealing the medical evidence to the defendant and by telling the defendant that they believed he sexually assaulted the victim before shaking her and placing her lifeless body in the pond. Doctor DeClue also concluded that, in addition to being involuntary, the defendant's statement was "not reliable" as a result of the police conduct and the defendant's tendency toward suggestibility. Finally, Doctor DeClue observed that the defendant never actually made a "statement" but answered yes or no to a series of questions, the majority of which were leading. To emphasize this point, Doctor DeClue created a list of all the words uttered by the defendant during his statement. He also noted that, as a result of the question and answer structure of the statement, many important details of the alleged killing were missing, like how the victim's body came to rest in the pond.

Former Assistant District Attorney General Amy Reedy testified that although she did not prepare the waiver of arraignment in this case, she had suggested that one be done. Ms. Reedy stated that she was not concerned with the timing of the defendant's arraignment because she did not think that "Rule 5 [of the Tennessee Rules of Criminal Procedure] would be important at all in General Sessions Court" and that, as a result, she "would [not] have concerned [her]self with Rules of Criminal Procedure" in the defendant's case. Ms. Reedy testified that she had never discussed the defendant's case with Mr. Rogers.

By stipulation, the defense read into the record the preliminary hearing testimony of McMinn County Sheriff's Department Detective B.J. Johnson. According to Detective Johnson's testimony, he took a statement from the defendant at the hospital, and after the victim was declared dead, he placed the defendant under arrest because the victim drowned while in his care and because the defendant had been drinking. Detective Johnson stated that a warrant was issued in the early morning hours of Friday, June 20, 2003, charging the defendant with criminally negligent homicide. Tests conducted that night showed that the defendant had a blood alcohol level of .10 and that there were no drugs in his system. Detective Johnson testified that the defendant was not arraigned on June 20 because the investigation was ongoing. According to Detective Johnson, he became aware sometime over the weekend that Mr. Rogers was representing the defendant but nevertheless approached the defendant on Monday, June 23, 2003, for the purpose of interrogating him and getting him to submit samples for DNA testing. Detective Johnson told the defendant that Mr. Rogers had informed the District Attorney's Office that he was no longer representing the defendant because the defendant could not afford to retain him. The transcript of the Monday morning interview contains the following statement by Detective Johnson to the defendant:

> [W]hen you mentioned Randy the other night - Randy Rogers - That's - We couldn't talk to you no more.  But then Randy was talking to the D.A.s and, I guess, you know, I don't know how much money he wanted or something, but there was a money problem.  So he said he couldn't represent you . . . .

During the Monday morning interview, Detective Johnson informed the defendant that he would be taken to court before 2:00 p.m. for an arraignment.  During this same interview, Lieutenant Fred Schultz informed the defendant that bond would be set that afternoon.

Testimony from McMinn County Sheriff's Department Detective Gary Miller established that some items were seized from the defendant's residence before the victim's mother gave consent to search the residence.

*State's Proof*

TBI Agent Barry Brakebill testified that he learned of the victim's death from Ms. Reedy and went to the hospital "strictly . . . for the examination of the victim."  Agent Brakebill stated that he remained at the hospital for approximately 45 minutes before traveling to the sheriff's department to interview the victim's mother, who reported that she had been working at the time of the incident.  After the interview, Agent Brakebill went to the Delashmitt residence, where he assisted in a brief search.  Agent Brakebill testified that the defendant was arrested at the hospital and charged that evening with criminally negligent homicide based on evidence that he had fallen asleep while the victim was in his care.  According to Agent Brakebill, an autopsy conducted the following day established that the victim had been sexually assaulted and that there was no water in her lungs, which he interpreted to mean that the victim "was already dead prior to going into the water."  Agent Brakebill testified that he did not work over the weekend but returned to the sheriff's department on Monday morning and suggested that the defendant be given a polygraph examination.  According to Agent Brakebill, after he learned that a polygraph examination could not be conducted until the late afternoon, he telephoned the general sessions court judge, who told him that the defendant must be brought in for arraignment by 2:00 p.m. unless he executed a waiver of arraignment.  Agent Brakebill stated that he contacted the District Attorney's office for preparation of the waiver, which he later explained to the defendant just prior to the polygraph examination.  According to Agent Brakebill, after the polygraph examination, Detective Johnson went into the room and took a statement from the defendant.  After the written statement was obtained, Agent Brakebill made a videotape recording of his discussing the written statement with the defendant.

During cross-examination, Agent Brakebill admitted that the defendant was not taken for an arraignment because the investigation was ongoing.  He acknowledged that the defendant was held in the holding cell in the booking area of the jail from the time of his arrest until the time of the polygraph examination.  Agent Brakebill conceded that he knew prior to the defendant's giving the inculpatory statement that he was represented by Mr. Rogers.  He also conceded telling the defendant that his arraignment would "have to" be postponed in order to do the polygraph examination.  Finally, Agent Brakebill admitted that the statement obtained by Detective Johnson was written entirely by Detective Johnson.

-8-

TBI Agent Malcolm Elrod, who administered the defendant's polygraph examination, testified that he was initially contacted by Agent Brakebill on the morning of June 23, 2003. He testified that, prior to conducting the examination, he administered *Miranda* warnings to the defendant, asked him to supply biographical information, and rehearsed the questions to be used during the examination. According to Agent Elrod, the examination is scored by "looking at the physical reactions that are occurring in the body when . . . a reviewed set of questions" is asked. Agent Elrod testified that the examination took place in the training room of the McMinn County Sheriff's Department, which was a large room with several windows, a chalk board, chairs, and tables. He recalled that although Agent Brakebill was present during the preliminary portion of the examination, only he and the defendant were present during the actual examination. Agent Elrod remembered that Agent Brakebill asked the defendant to sign a "Waiver of Arraignment" just before the polygraph examination began.

Agent Elrod testified that he actually administered two tests, "one asking questions about whether or not he had sexually abused the baby, and another test of whether or not he'd had anything to do with causing injury or death of the baby." According to Agent Elrod, the "test about the sexual abuse" was inconclusive and the second test established that the defendant "was practicing deception about causing harm or the death of the baby." Agent Elrod stated that "after we talked for a bit, [the defendant] stated that he had in fact had sex with the baby and had in fact killed the baby."

During cross-examination, Agent Elrod testified that he used the polygraph examination as an investigative tool in this case and that, as per TBI general policy, he did not record the examination. He stated that the examination period began at 3:35 p.m. and was finished before 5:00 p.m., with the preliminary portion taking the bulk of the time. Agent Elrod conceded that he interrogated the defendant for two hours after the conclusion of the polygraph examination before the defendant made any admission of wrongdoing. He admitted, however, that the defendant did not actually admit to killing the victim and, instead, admitted only to shaking her. Agent Elrod stated that he "knew" prior to administering the polygraph examination that the defendant had sexually assaulted and shaken the victim before placing her in the pond. Agent Elrod acknowledged that he told the defendant that he did not believe that the defendant was innocent and also admitted using leading questions to obtain the defendant's statement. Finally, Agent Elrod conceded that the defendant's statement contains little detail of the alleged offenses and no actual admission of killing.

In an extremely thorough written order filed after the conclusion of the hearing, the trial court suppressed the defendant's statement, concluding that law enforcement officers had violated the defendant's constitutional and statutory protections. The trial court found that the defendant was held in isolation in the holding cell in the booking area "from late Thursday night until Monday evening and that the only person he had contact with other than law enforcement officers was his one visit with Mr. Rogers." The court expressly accredited the testimony of Mr. Rogers that "he left the impression with the defendant and the defendant's family that he would represent the defendant during any preliminary matters and that he should be contacted before anyone spoke with the defendant." The trial court found "that the defendant had unambiguously requested counsel prior to the time he was approached by the officers for questioning." The court observed that "Officer Johnson's own statements are clear that he not only understood from the defendant's own statements that he had requested counsel but also knew that he could not talk to the

defendant because the defendant had unambiguously requested counsel when approached by the officer" and that the recording of Detective Johnson's Monday morning conversation with the defendant establishes that the defendant had requested counsel "at some point over the weekend." The trial court found "that the authorities were the ones who informed the defendant that Mr. Rogers was no longer his attorney and that this was done in an attempt to talk to him further. These actions are what subsequently resulted in the statements from the defendant." The court also found "that there is no credible evidence that the defendant initiated the additional questioning." The court concluded that "the defendant's right to counsel was violated under both the Fifth and Sixth Amendments of the United States Constitution."

The trial court also determined that the defendant's right to be free from unreasonable seizure and his statutory right to a timely judicial determination of probable cause were violated by the excessive detention prior to arraignment. The court found, "It is clear in the record that the defendant had asked what he was being charged with and had not received an answer, despite the fact that he had been in custody for approximately 85 hours." Regarding the "Waiver of Arraignment" executed by the defendant before the polygraph examination, the trial court found that the waiver "said very little, was signed well after the defendant should have been in court, and was, in this court's opinion, invalid based upon the invocation of the defendant's right to counsel, which had already been violated." The court further found that "[t]he officers candidly admitted that the case against the defendant was investigated and built during the time he was being held in custody" and that "the police action was purposeful" rather than the result of inadvertence or oversight. The court determined that the defendant was not arraigned until "well over 100 hours after he was first taken into custody." The court also noted that although the arrest warrant states that it was served on Monday, June 23, 2003, it was not signed by the judicial officer until the following day. The trial court found, "Based upon all the evidence presented, . . . the totality of the circumstances and factors weigh in favor of the suppression of the statement . . . ."

*Review and Adjudication*

In this appeal, the State contends that the trial court erred by suppressing the defendant's statement because "the defendant's confession was voluntary and not the result of unnecessary delay." The defendant submits that the trial court properly suppressed the statement.

At the suppression hearing, the State has the burden of demonstrating by a preponderance of the evidence that the defendant's statements were voluntarily, knowingly, and intelligently given. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). The trial court is the trier of fact, and its factual findings are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced

at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. *Id.*; *Daniel*, 12 S.W.3d at 423. The State, as the appealing party, bears the burden of establishing that the evidence preponderates against the finding of the trial court. *Odom*, 928 S.W.2d at 23; *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984); *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999). We review the State's claim with these standards in mind.

We also review the issue presented with these well-settled general principles in mind. A confession must be free and voluntary, and it must neither be extracted by any sort of threats or violence nor obtained by any direct or implied promises, nor by the exertion of any improper influence or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *Kelly*, 603 S.W.2d at 728. When considering the voluntariness of a confession, this court must examine the totality of the circumstances surrounding the confession to determine "'whether the behavior of . . . law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Kelly*, 603 S.W.2d at 728 (quoting and adopting the standard set forth in *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)).

### I. Right to Counsel under the Fifth and Sixth Amendments

The Fifth Amendment to the United States Constitution provides that "no person . . .shall be compelled in any criminal case to be a witness against himself ." U. S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). Similarly, Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "Encompassed within these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation." *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003).

When there is an unequivocal request for an attorney, all interrogation must cease, unless the suspect himself initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994). "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884-85. The determination whether the accused made a request for an attorney, equivocal or unequivocal, is a question of fact for the trial court to determine. *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).

The Sixth Amendment to the United States Constitution guarantees that, "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend VI. A defendant has the right to counsel at all "'critical' stages in the criminal justice process' where the results might well settle the accused's fate and reduce the trial

-11-

itself to a mere formality.'" *Maine v. Moulton*, 474 U.S. 159, 170, 106 S. Ct. 477, 484 (1985) (quoting *United States v. Wade*, 388 U.S. 218, 224, 87 S. Ct. 1926, 1931 (1967)). The right to counsel embodied in the Sixth Amendment, however, "'attaches only at or after the initiation of adversary proceedings against the defendant . . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88, 104 S. Ct. 2292, 2297 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89, 92 S. Ct. 1877, 1881-82 (1972)). This interpretation comports with the underlying purposes of the Sixth Amendment:

> That interpretation of the Sixth Amendment right to counsel is consistent not only with the literal language of the Amendment, which requires the existence of both a "criminal [prosecution]" and an "accused," but also with the purposes which we have recognized that the right to counsel serves. We have recognized that the "core purpose" of the counsel guarantee is to assure aid at trial, "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor."

*Id.* at 188-89 (quoting *United States v. Ash*, 413 U.S. 300, 309, 93 S. Ct. 2568, 2573 (1973)). In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant precedes the hearing, or an indictment or presentment when the charge is initiated by the grand jury, marks the initiation of criminal charges after which the Sixth Amendment right to counsel attaches. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980).

In this case, the defendant was arrested at the hospital sometime after 9:00 p.m. on June 19, 2003, and served with an arrest warrant charging him with criminally negligent homicide sometime in the early morning hours of June 20, 2003. The issuance of the arrest warrant on June 20, 2003, marked the initiation of formal charges in this case and also marked the attachment of the Sixth Amendment right to counsel. In addition, the trial court found, and the record confirms, that the defendant made a request for counsel at some point over the weekend when confronted by Detective Johnson. Contrary to the State's assertion that "the trial court did not point to any statement that could reasonably be construed to constitute unequivocal or unambiguous invocations of [the defendant's] right to silence or his right to an attorney," the trial court highlighted the statements made by Detective Johnson during his recorded conversation with the defendant on Monday June 23, 2003. During that conversation, Detective Johnson made it "clear that he not only understood from the defendant's statements that he had requested counsel but also knew that he could not talk to the defendant because the defendant had unambiguously requested counsel when approached by the officer" over the weekend. We agree that Detective Johnson's statements establish that he had attempted to question the defendant sometime between Friday and Monday and that the defendant had indicated, at that time, that he was represented by Mr. Rogers. This finding dovetails with the trial court's finding that Mr. Rogers told the defendant he would represent him during any interrogation and instructed him to refuse any further questioning outside the presence of counsel. Accordingly, the defendant's right to counsel under the Fifth Amendment attached at some point prior to the morning of June 23, 2003.

-12-

Because the right to counsel had attached, only the defendant could have constitutionally initiated any further interrogation. *See Edwards*, 451 U.S. at 484-85, 101 S. Ct. at 1884-85. That did not happen in this case. The record is clear, and the trial court so found, that it was Detective Johnson who initiated the Monday morning interview with the defendant. At that point, Detective Johnson asked the defendant questions and requested that he provide samples for DNA testing. Equally clear in the record is that Detective Johnson was the person who told the defendant that he no longer had the benefit of counsel. Detective Johnson's interrogation of the defendant after being made aware that the defendant was represented by Mr. Rogers and wished to have Mr. Rogers present during any interrogation was unconstitutional. The detective's deliberately informing the defendant that he was without counsel for the purpose of obtaining a statement from him is egregiously unconstitutional. Clearly, the interrogation period that began on the morning of June 23, 2003, and culminated in the defendant's giving of an inculpatory statement violated the defendant's right to counsel under both the Fifth and Sixth Amendments to the United States Constitution.

The State makes much of the fact that the defendant signed a waiver of his *Miranda* rights prior to taking the polygraph examination in this case and contends that this waiver was sufficient to waive the defendant's right to counsel under both the Fifth and Sixth Amendments. However, the State's argument again overlooks the fact that it was Detective Johnson who initiated the further questioning that preceded the *Miranda* waiver and polygraph examination. The trial court specifically found that "there [was] no credible evidence that the defendant initiated the additional questioning." Because the *Miranda* waiver executed prior to the polygraph examination, the only one executed *after* the defendant had invoked his right to counsel, was itself born of the violation of the defendant's right to counsel, it is invalid. The Supreme Court, in *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404 (1986), held that an admonition and waiver of *Miranda* rights "could not establish a valid waiver" after there had been a request for counsel, explaining that "just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." *Id.* at 635, 106 S. Ct. at 1410-11. The Court observed, "*Edwards* is grounded in the understanding that 'the assertion of the right to counsel [is] a significant event,' and that 'additional safeguards are necessary when the accused asks for counsel.'" *Id.* at 636, 106 S. Ct. at 1411 (quoting *Edwards*, 451 U.S. at 484, 485, 101 S. Ct. at 1884, 1885).

In sum, the defendant's right to counsel under both the Fifth and Sixth Amendments was violated when officers approached him on June 23, 2003, and asked him to talk to them about the case and to provide samples for DNA testing. Further, the *Miranda* waiver signed by the defendant before the polygraph examination was the direct result of the violation of the defendant's right to counsel and was invalid. Finally, because the defendant's statement was obtained in violation of his right to counsel, it must be suppressed, regardless of whether it was voluntarily given.

## II. Unreasonable Delay and the Fourth Amendment

The State also contends that the trial court should not have excluded the defendant's statement as violative of either the Fourth Amendment of the United States Constitution or Rule 5

of the Tennessee Rules of Criminal Procedure because the statement was voluntarily given. The defendant asserts that the trial court correctly ruled that the inordinate delay in taking the defendant to be arraigned justifies the exclusion of the statement under both the Fourth Amendment and Rule 5. We agree with the defendant.

*A. Rule 5*

Rule 5 of the Tennessee Rules of Criminal Procedure provides that "[a]ny person arrested-except upon a capias pursuant to an indictment or presentment-shall be taken without unnecessary delay before the nearest appropriate magistrate." Tenn. R. Crim. P. 5(a)(1). In *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996), our supreme court observed that "incarceration for any period of time is inherently coercive," *id.* at 670, and that "the intimidating environment [created by incarceration] is no doubt exacerbated" by unnecessary delay in taking the accused before a magistrate, *id.* Rule 5 is designed to protect the accused's right to a prompt judicial determination of probable cause. A violation of this rule, however, does not necessarily require the exclusion of the defendant's statement. *Id.* at 670. Instead, a statement will be excluded "only if an examination of the totality of the circumstances reveals that the statement was not voluntarily given." *Id.* The circumstances to be examined include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

*Id.* at 671 (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)). "[T]he focus on unnecessary delay should not be solely on the length of the delay, but rather on the circumstances of the delay and their effect on the accused." *Id.* The length of the delay is nevertheless a significant factor in determining the voluntariness of a confession. *Id.*

Here, the 33-year-old defendant was arrested shortly before midnight on June 19, 2003, and was not arraigned until June 24, 2003. After his arrest, authorities placed the defendant in a small holding cell inside the booking area of the jail, where he was held until being taken to the training room for the polygraph examination. The trial court accredited testimony that the holding cell was continuously lit, making it difficult for the defendant to sleep, and that there were no windows or other outlet by which the defendant could mark the passage of time. The defendant was not permitted to shower or otherwise leave the area. During the detention, the defendant's only non-law enforcement visitor was Mr. Rogers. The trial court accredited the testimony of Doctor DeClue

-14-

that the defendant had an IQ of 78, which is borderline mentally retarded, and that he was especially susceptible to suggestion. The court also accredited Doctor DeClue's testimony that the defendant's poor working memory, substandard reading skills, and ninth grade education made it unlikely that he understood the waivers of his *Miranda* rights and arraignment. The record supports the trial court's conclusion that "the case against the defendant was investigated and built during the time he was being held in custody." Although the defendant been arrested previously, he had never faced charges of the magnitude of those in this case. Upon our examination of these factors, we agree with the trial court that "the totality of the circumstances and factors weigh in favor of the suppression of the statement under Rule 5 of the Tennessee Rules of Criminal Procedure."

The State points to the various waivers executed by the defendant as indicative of the voluntariness of his statement. As we have previously indicated, however, the waivers executed immediately prior to the polygraph examination were obtained in violation of the defendant's right to counsel under both the Fifth and Sixth Amendments and, as a result, did not operate as valid waivers. Similarly, the trial court found that the "Waiver of Arraignment" signed by the defendant "said very little, was signed well after the defendant should have been in court, and was . . . invalid based upon the invocation of the defendant's right to counsel, which had already been violated." The record supports this conclusion. The waiver states, in its entirety, "You have the right to an arraignment within a reasonable time period. I hereby waive my arraignment until June 24, 2003." The document contains no explanation of either the terms "arraignment" or "reasonable time period." In addition, there is no evidence that the defendant was told that he should have been taken for an arraignment nearly two hours before he signed the document. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). In this case, the State has failed to establish that the defendant intentionally relinquished a known right. As such, it is our view that the "Waiver of Arraignment" had no effect on the voluntariness of his statement.

The State also contends that "the defendant's own desire to show his innocence and take a polygraph examination caused the delay" in this case. This assertion is simply not supported by the record. The record is clear that it was Agent Brakebill who suggested that the defendant take a polygraph examination and that it was Agent Brakebill who directed the creation of the "Waiver of Arraignment" in this case. In addition, it was Agent Brakebill who told the defendant that he could only take the polygraph examination if he waived his arraignment. Neither Agent Brakebill nor Agent Elrod provided any explanation for why the polygraph examination could not have been conducted after the defendant's arraignment. The State's brief is similarly devoid of any explanation for why the taking of the polygraph examination necessitated the delay in arraignment.

*B. The Fourth Amendment*

In *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975), the Supreme Court held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," *id.* at 114, 95 S. Ct. at 863, and that "this determination must be made by a judicial officer either before or promptly after arrest," *id.* at 125, 95 S. Ct. at 869. Sixteen years later, the Court concluded that "it is not enough to say that probable

cause determinations must be 'prompt.' This vague standard simply has not provided sufficient guidance." *County of Riverside v. McLaughlin*, 500 U.S. 44, 55-56, 111 S. Ct. 1661, 1669 (1991). The Court ruled "that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56, 111 S. Ct. at 1670. The Court held that delays in excess of 48 hours will require more scrutiny:

> Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. Nor, for that matter, do intervening weekends. . . .

*Id.* at 57, 111 S. Ct. at 1670.

In this case, the delay between the defendant's arrest on June 19, 2003, and his arraignment on June 24, 2003, far exceeded the 48 hour period approved in *Gerstein*. Accordingly, the burden is on the State to establish "a bona fide emergency or other extraordinary circumstance." The State correctly points out that the defendant was served with an arrest warrant charging him with criminally negligent homicide on June 20, 2003, and that, as a general rule, "the issuance of a valid arrest warrant satisfies the requirement that there must be a judicial determination of probable cause for extended detention." *State v. Carter*, 16 S.W.3d 762, 766 (Tenn. 2000) (citing *Baker v. McCollan*, 443 U.S. 137, 143, 99 S. Ct. 2689, 2694 (1979)). The record establishes, however, that the issuance of the criminally negligent homicide warrant was not the cause of the extended detention in this case. Indeed, after Mr. Rogers successfully secured a bond on that warrant, Detective Johnson telephoned the judge and asked that the bond be rescinded pending "issuance of an additional warrant." As the trial court found, the "officers candidly admitted that the case against the defendant was investigated and built during the time he was being held in custody." Both Agent Brakebill and Detective Johnson testified that they expected to charge the defendant with a more serious crime after the autopsy was conducted on Friday. Nevertheless, the warrant charging the defendant with first degree murder was not served on the defendant until June 23, 2003, and not signed by a judicial officer until June 24, 2003. The State offers no evidence of "a bona fide emergency or other extraordinary circumstance" to justify the delay in this case. The State does assert, however, that the defendant's statement is nevertheless admissible because it "was sufficiently of his free will that it should not be suppressed."

In *Huddleston*, our supreme court emphasized that "[t]he voluntariness test is not the proper vehicle for analyzing whether a Fourth Amendment violation requires suppression of a statement" because that test "is designed to protect the Fifth Amendment right against self-incrimination by excluding a statement that is obtained as a result of coercion by law

-16-

enforcement officials" and "does not address the interests implicated by a Fourth Amendment violation." *Huddleston*, 924 S.W.2d at 673-74. Instead, the State must establish not only "that the statement meet[s] the Fifth Amendment standard of voluntariness but that it [is] sufficiently an act of free will to purge the primary taint" of the Fourth Amendment violation. *Id.* at 674; *see also Brown v. Illinois*, 422 U.S. 590, 598, 95 S. Ct. 2254, 2259 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S. Ct. 407, 416 (1963)) (holding that when considering whether a statement obtained in violation of the Fourth Amendment must be suppressed, the question is "whether [the statement] 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'").

The Supreme Court concluded that no single factor is determinative, instead examination of several factors is necessary to determine if the confession was an act of the accused's free will:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown*, 422 U.S. at 603-04, 95 S. Ct. at 2261-62 (citations omitted).

As to the threshold question of voluntariness, we have already determined that the defendant's statement was not voluntarily given. Because the State has failed to meet the threshold requirement, it has failed to establish that the defendant's confession is admissible despite the Fourth Amendment violation.

Considering nevertheless the other factors, the record establishes that although the defendant was given *Miranda* warnings on more than one occasion, only the admonition and waiver signed just prior to the polygraph examination preceded an inculpatory statement by the defendant. Moreover, we have determined that the waiver was invalid based upon the violation of the defendant's Fifth and Sixth Amendment right to counsel. The record supports the trial court's conclusion that this factor weighs in favor of the defendant.

Regarding the temporal proximity of the arrest and the statement, the record establishes that the defendant signed the statement written by Detective Johnson approximately 90 hours after he had been arrested. The defendant was not arraigned until the following morning, nearly 100 hours after his arrest. We agree with the trial court that this factor weighs in favor of the defendant.

The State insists that the defendant's visit with Mr. Rogers constitutes an intervening circumstance sufficient to purge the taint of the delay. We disagree. Nothing in the record suggests

-17-

that the defendant's brief visit with Mr. Rogers in any way purged the taint of the delay. To the contrary, the defendant's visit from Mr. Rogers exacerbated the taint of the delay because the officers used the information that the defendant had visited with Mr. Rogers against him. Detective Johnson told the defendant that Mr. Rogers had declined to represent him because the defendant was unable to pay a fee. The detective then preyed on the defendant's belief that he was without the benefit of counsel in order to obtain an inculpatory statement from him. The State also suggests that the polygraph examination was an intervening circumstance because "the defendant voluntarily chose to postpone his arraignment so that he could" take the test. The record establishes, however, that Agent Brakebill suggested that the defendant take the polygraph examination and told the defendant that he would be required to waive his arraignment in order to do so. In addition, we have already determined that the defendant's waiver of his arraignment was invalid.

The State also contends that "[t]here is no evidence that the defendant in this case was held for the purpose of gathering additional evidence." The record belies this statement. Agent Brakebill candidly admitted that the defendant was not taken for an arraignment because the investigation was ongoing and that he expected that additional charges would be added after the victim's autopsy. Similarly, Detective Johnson admitted that he asked Judge Bebb to rescind the defendant's bond to ensure that he was held pending charges he believed would be added after the victim's autopsy. We agree with the trial court "that the police action was purposeful." Accordingly, this factor weighs in favor of the defendant.

Because each of the factors weighs in favor of the defendant, the State has failed to establish that the defendant's statement was sufficiently attenuated from the Fourth Amendment violation to support its admissibility. In consequence, the trial court properly suppressed the statement.

**CONCLUSION**

The State has failed to establish that the evidence preponderates against the findings of fact made by the trial court. To the contrary, the record amply supports each of the factual findings. Further, the record mandates the suppression of the defendant's statement on a number of grounds. First, the record clearly establishes that the statement was obtained in violation of the defendant's right to counsel under both the Fifth and Sixth Amendments. In addition, the statement was obtained in violation of the defendant's right to a prompt judicial determination of probable cause under both Rule 5 of the Tennessee Rules of Criminal Procedure and the Fourth Amendment. The State has failed to establish that the statement is admissible despite these violations. Accordingly, the judgment of the trial court suppressing the defendant's statement is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-18-